**SEWER AUTHORITY OF the CITY OF SCRANTON, Petitioner**

v.

**PENNSYLVANIA INFRASTRUCTURE INVESTMENT AUTHORITY OF the COMMONWEALTH of Pennsylvania, and Paul Marchetti, in His Official Capacity as Executive Director, Respondents.**

Commonwealth Court of Pennsylvania.

Argued June 17, 2013.

Decided Nov. 12, 2013.

the pendency of a workmen's compensation proceeding." *Id.* at 372, 613 A.2d at 134.

1032

Jeffrey Belardi, Scranton, and Richard H. Sedgley, Richmond, VA, for petitioner.

William H. Lamb and Scot R. Withers, West Chester, for respondents.

BEFORE: McGINLEY, Judge, and LEADBETTER, Judge, and JAMES GARDNER COLINS, Senior Judge.

OPINION BY Judge LEADBETTER.

Before the Court are (1) a motion for summary relief "in the form of judgment on the pleadings" filed by the Sewer Authority of the City of Scranton (Sewer Authority) in its action against the Pennsylvania Infrastructure Investment Authority of the Commonwealth of Pennsylvania (PENNVEST) and PENNVEST's

executive director, Paul Marchetti, (collectively PENNVEST), and (2) PENNVEST's preliminary objections to the Sewer Authority's first amended petition for review.

Pursuant to a Funding Agreement entered into with PENNVEST in 2012, the Sewer Authority obtained a low-interest loan from PENNVEST to finance a project of improving the wastewater treatment facility. In this action, the Sewer Authority challenges the validity of Section D.35 of the Funding Agreement, which granted PENNVEST the ownership of "nutrient credits" to be generated by the Sewer Authority, to the extent of the value of the interest rate subsidy provided by PENNVEST. The Sewer Authority also alleges that PENNVEST breached the Funding Agreement by refusing to disburse the loan fund.

The central issue to be decided is whether Section D.35 of the Funding Agreement is void because it effectively increased the subsidized interest rate to the market rate, thereby exceeding the maximum interest rate set forth in Section 10(f) of the Pennsylvania Infrastructure Investment Authority Act (Investment Authority Act), Act of March 1, 1988, P.L. 82, *as amended*, 35 P.S. § 751.10(f). The Court must also decide whether the Sewer Authority stated a valid cause of action for a breach of contract. After careful consideration, we deny the Sewer Authority's motion for summary relief and sustain PENNVEST's preliminary objections in part. We dismiss the Sewer Authority's action to the extent that it challenges the validity of Section D.35 of the Funding Agreement.

## I.

The Sewer Authority is a municipal authority established under the Municipality Authorities Act, 53 Pa.C.S. §§ 5601–5623, and was required by the National Pollutant Discharge Elimination System (NPDES) permit to substantially reduce the discharge of "nutrients," i.e., "[n]itrogen or phosphorus," into Lackawanna River by April 1, 2013. Section 3 of the Water and Sewer Systems Assistance Act, Act of July 9, 2008, P.L. 915, 32 P.S. § 695.3. Upon noncompliance with the NPDES permit requirement, the Sewer Authority is subject to civil penalties imposed by the Pennsylvania Department of Environmental Protection (DEP) and the United States Environmental Protection Agency (EPA). The United States filed an action against the Sewer Authority, on behalf of EPA, in the United States District Court for the Middle District of Pennsylvania seeking injunctive relief and civil penalties for violations of the Clean Water Act, 33 U.S.C. §§ 1251–1387. In that action, in which DEP intervened, the court issued a consent decree in January 2013, requiring the Sewer Authority to construct a new biological nutrient removal facility by August 1, 2014. *United States v. Scranton Sewer Auth.* (No. 3:CV–09–1873, filed January 31, 2013). The consent decree also set forth stipulated penalties to be imposed upon the Sewer Authority's noncompliance.

PENNVEST is an instrumentality of the Commonwealth established by the Investment Authority Act.[1] In enacting the Investment Authority Act, the Legislature found, *inter alia*, that "[m]any water and sewage systems in this Commonwealth are aging, outmoded, inadequate, deteriorating

---

1. PENNVEST consists of a 13–member board of directors: the Governor, the Secretaries of Environmental Protection, Commerce, Community Affairs, General Services and Budget, 2 Senators, 2 House of Representatives, and 3 individuals appointed by the Governor to serve a 2–year term. Section 4(b) of the Investment Authority Act, 35 P.S. § 751.4(b).

and operating above capacity" and that "[f]inancing of water and sewage projects and storm water projects at affordable cost is not currently available in many areas of this Commonwealth." Section 2(2) and (5) of the Investment Authority Act, 35 P.S. § 751.2(2) and (5).

In 2008, the Legislature authorized the incurring of indebtedness in the amount of $400,000,000 for grants and loans to be awarded by PENNVEST for "projects." Section 8(a) of the Water and Sewer Systems Assistance Act, 32 P.S. § 695.8(a). The term "project" is defined to include "[t]he acquisition, construction, improvement, expansion, extension, repair, rehabilitation or security measures of all or part of a facility or system for ... the collection, treatment or disposal of wastewater, including industrial waste ... and ... *the reduction of nitrogen, phosphorus* and sediment to comply with Pennsylvania's Chesapeake Bay Tributary Strategy, including the purchase or trading of *nutrient credits.*" Section 3 of the Water and Sewer Systems Assistance Act (emphasis added).[2] A "nutrient credit" is "[t]he unit of compliance that corresponds with a pound of reduction of a nutrient and that has been approved by [DEP]." *Id.* Under this definition, if the actual nutrient discharge amount is less than the discharge limit set forth in an NPDES permit, the difference is a nutrient credit. Nutrient credits can be sold to another entity which can use them to reduce the nutrient discharge

amount exceeding the allowable limit. Section 8(e) of the Water and Sewer Systems Assistance Act provides that "[n]othing in this act shall prohibit the use of funds allocated under the provisions of this act for projects involving the purchase or trading of nutrient credits."

On March 6, 2012, PENNVEST and the Sewer Authority entered into a Funding Agreement, in which the Sewer Authority agreed to obtain a loan in the amount of $11,256,361 from PENNVEST at a subsidized interest rate to finance a project of improving the existing wastewater treatment facility to reduce the nutrient discharge. The interest rate for the loan was 1% for the first 5 years of the term of the loan and 1.51% for the remainder of the term.[3] PENNVEST agreed to disburse the loan fund in increments as progress payments upon the Sewer Authority's request. Paragraph F.2.a of the Funding Agreement.

Section D.35 of the Funding Agreement ("Nutrient/Environmental Credits") further provided in relevant part:

> The nutrient credits, or any other marketable environmental credits, (if any)[,] generated as a result of this subsidized funding, as well as any proceeds derived from the subsequent sale of the same, *shall be the property of [PENNVEST] to the extent of the value of the subsidy associated with credit generating project*

---

**2.** Section 3 of the Investment Authority Act, 35 P.S. § 751.3, similarly defines a "project" as: "[t]he eligible costs associated with the acquisition, construction, improvement, expansion, extension, repair, rehabilitation or security measures of all or part of any facility or system ... for the collection, treatment or disposal of wastewater, including industrial waste...." PENNVEST also receives funds from EPA under a Grant Agreement to finance construction of wastewater treatment facilities and water quality management activ-

ities. Exhibit A to the First Amended Petition for Review.

**3.** The minimum interest rate on a loan is 1%. Section 10(f) of the Investment Authority Act. Because the Sewer Authority's project is located in a county "whose unemployment rate exceeds the Statewide unemployment rate by 40% or more," the maximum interest rate for the Sewer Authority's loan was 1% for the first five years and 25% of the bond issue rate for the remainder of the term of the loan. *Id.*

*components.* Thus a grant, principal forgiveness offer or *subsidized interest rate loan shall afford [PENNVEST] ownership in the credits and proceeds derived therefrom in an amount equal to* the grant, principal forgiveness or *the present value of the interest rate subsidy provided, to the extent such funds were used to finance credit generating project components, including a proportionate share of indirect costs.* A preliminary estimate of the value of the subsidy has been calculated and included in the Project Management Plan attached hereto as Exhibit E. Once final project costs are determined, the final value of the subsidy will be calculated by [PENNVEST] at the time of project closeout. Funding Recipient shall take all steps necessary to certify, verify or register any nutrient credits or other credits generated as a result of the Project Funding that are owned by [PENNVEST] and for which [PENNVEST] requests such steps to be taken on the part of the Funding Recipient. [Emphasis added.]

Exhibit 1 to the First Amended Petition for Review. The value of the subsidy for the Sewer Authority's loan was estimated to be $2,105,850.86.

In a letter dated May 22, 2012, PENNVEST's executive director, Paul Marchetti, asked the Sewer Authority's executive director, Eugene Barrett, to take all steps by June 29, 2012 to obtain DEP's certification of nutrient credits. Barrett thereafter questioned PENNVEST's authority to recoup the value of the subsidy provided for the loan. Marchetti then responded:

In collaboration with [DEP] and with the approval of [EPA], PENNVEST has created the PENNVEST Nutrient Credit Clearinghouse, a clearing exchange maintained by PENNVEST whereby the agency enters into nutrient credit purchase agreements with nutrient credit buyers and nutrient credit sales agreements with nutrient credit sellers. The Nutrient Credit Clearinghouse was created for the purpose of promoting stability in Pennsylvania's Nutrient Credit Trading Program and ultimately providing more efficient ways for [NPDES] permittees to meet their effluent limits for the Chesapeake Bay Watershed, thereby improving water quality within the Commonwealth.

The nutrient credits that will be owned by PENNVEST by virtue of the Nutrient/Environmental Credit term set forth above, are intended to support the viability of the PENNVEST Clearinghouse, and will support PENNVEST in carrying on its business. . . .

Marchetti's Letter dated September 18, 2012 at 2–3; Exhibit 3 to the First Amended Petition for Review. Marchetti demanded that Barrett acknowledge and consent to the validity of Section D.35 of the Funding Agreement by signing and returning the letter within 45 days. *Id.* at 6. PENNVEST subsequently placed a "do not process" hold on the Sewer Authority's request made on October 24, 2012 for a second incremental disbursement of the loan fund in the amount of $1,072,465.36.[4] After PENNVEST rejected a demand to remove the do-not-process hold, the Sewer Authority filed the instant action in this Court's original jurisdiction.

In Count I (declaratory judgment) of the first amended petition for review, the Sewer Authority seeks a declaration that Section D.35 of the Funding Agreement is

---

4. PENNVEST previously processed the Sewer Authority's first request made in July 2002 for a disbursement of $1,885,415.82.

void and must be excised from the Funding Agreement. In Count I, the Sewer Authority also seeks to enjoin PENNVEST from breaching the Funding Agreement by placing the do-not-process hold on the disbursement request. In Count II (breach of contract), the Sewer Authority seeks a declaration that PENNVEST's withholding of the loan fund constitutes a breach of contract. The Sewer Authority also seeks to enjoin PENNVEST from breaching the contract. After the filing of the first amended petition for review, the Sewer Authority filed a motion for summary relief "in the form of judgment on the pleadings." PENNVEST then filed preliminary objections to the first amended petition for review in the nature of demurrer and raising the Sewer Authority's failure to state causes of action for declaratory and injunctive relief in separate counts.

Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure, Pa. R.A.P. 1532(b), provides that "[a]t any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear." Summary relief may not be granted if there exists any disputed issue of material fact. *Jubelirer v. Rendell,* 598 Pa. 16, 28, 953 A.2d 514, 521 (2008). In ruling on preliminary objections in the nature of a demurrer, the Court must accept as true all well-pleaded allegations of material fact as well as inferences deducible therefrom. *Cnty. of Dauphin v. City of Harrisburg,* 24 A.3d 1083, 1089 (Pa.Cmwlth.2011). A demurrer may be sustained only where it appears that the law will not permit recovery. *Id.* Any doubt must be resolved in favor of overruling a demurrer. *Id.*[5]

## II.

PENNVEST argues that Count I seeking a declaration that Section D.35 of the Funding Agreement is void should be dismissed for a lack of actual case or controversy over the ownership of nutrient credits. PENNVEST maintains that the Sewer Authority's generation of nutrient credits is merely a possibility at present time, noting that the Sewer Authority must first generate an amount of nutrient discharge less than the amount permitted by the NPDES permit in any given year and must then obtain DEP's verification of nutrient credits. The Sewer Authority counters that declaratory relief sought in Count I is ripe for the Court's determination because there is a real dispute over the ownership of nutrient credits between the parties.[6]

---

**5.** PENNVEST argues that the Sewer Authority's motion for summary relief "in the form of judgment on the pleadings" should be dismissed because it was filed before the close of pleadings, citing Rule 1034(a) of the Pennsylvania Rules of Civil Procedure, Pa. R.C.P. No. 1034(a), which provides that any party may move for judgment on the pleadings "[a]fter the relevant pleadings are closed, but within such time as not to unreasonably delay the trial." Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure, however, expressly permits a party to seek summary relief "[a]t any time after the filing of a petition for review." A motion for summary relief filed under Rule 1532(b) is "similar to the type of relief envisioned by the Pennsylvania Rules of

Civil Procedure regarding judgment on the pleadings and peremptory and summary judgment." Note to Rule 1532. Unlike a motion for judgment on the pleadings, however, summary relief "may be requested before the pleadings are closed where the right of the applicant is clear." *Id.* Therefore, the Sewer Authority was permitted to file the motion for summary relief before the close of pleadings, seeking our immediate disposition of the action.

**6.** PENNVEST filed an application to strike two exhibits attached to the Sewer Authority's memorandum of law in opposition to the preliminary objections: the affidavit of the Sewer Authority's engineer, Peter F. Schuler (Exhib-

Section 7533 of the Declaratory Judgments Act, 42 Pa.C.S. § 7533, provides that "[a]ny person interested under a ... written contract ... or whose rights, status, or other legal relations are affected by a statute ... contract or franchise, may have determined any question of construction or validity arising under the ... contract, or franchise, and obtain a declaration of rights, status, or other legal relations thereunder." The Act was enacted "to curb the courts' tendency to limit the availability of judicial relief to only cases where an actual wrong has been done or is imminent." *Bayada Nurses, Inc. v. Dep't of Labor & Indus.*, 607 Pa. 527, 541, 8 A.3d 866, 874 (2010). The purpose of the Act is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations" and, accordingly, the Act should "be liberally construed and administered." Section 7541(a) of the Declaratory Judgments Act, *as amended,* 42 Pa.C.S. § 7541(a). Under the general ripeness doctrine, however, the plaintiff seeking declaratory relief must demonstrate the existence of an actual controversy "indicating imminent and inevitable litigation." *Buehl v. Beard,* 54 A.3d 412, 419 (Pa.Cmwlth.2012). A matter is ripe for judicial review if the issues are adequately developed and a party will suffer hardship by a delay of review. *Bayada Nurses,* 607 Pa. at 542, 8 A.3d at 874.

The record in this matter sufficiently demonstrates the existence of an actual controversy over the ownership of nutrient credits. After the Sewer Authority's executive director, Barrett, disputed PENNVEST's authority to recoup the value of the subsidy provided to the Sewer Authority in Section D.35 of the Funding Agreement, PENNVEST's executive director, Marchetti, demanded that Barrett acknowledge and consent to the validity of Section D.35 of the Funding Agreement and thereafter stopped processing the Sewer Authority's request for a loan fund disbursement. The Sewer Authority alleges that PENNVEST's refusal to disburse the loan fund threatens completion of the project and exposes the Sewer Authority to the penalties for noncompliance with the NPDES permit and the consent decree. The parties adequately developed the issue of Section D.35's validity in the pleadings and memoranda of law. The mere fact that the amount of nutrient credits to be generated by the Sewer Authority and certified by DEP are currently unknown does not hinder our review of the issue. The resolution of the issue in this action will afford the parties relief from the uncertainty of their rights and obligations under the Funding Agreement.

III.

The Sewer Authority argues that Section D.35 of the Funding Agreement is void because it effectively increased the interest rate to the market rate, which exceeds the maximum interest rate allowed by Section 10(f) of the Investment Authority Act. It maintains that Section

---

it 1), and the article written by Marchetti in August 2012, *liquid Water Markets* (Exhibit 2). The Sewer Authority attached those exhibits to counter PENNVEST's arguments that there is no actual controversy supporting the declaratory judgment action because the Sewer Authority's generation of nutrient credits is uncertain, and that PENNVEST is not required to promulgate regulations to claim the ownership of nutrient credits. To dispose of the legal issues raised by PENNVEST's demurrers, we must accept as true the Sewer Authority's well-pleaded allegations in the first amended petition for review but may not consider any testimony or evidence outside of the pleading. *Mistick, Inc. v. Nw. Nat'l Cas. Co.,* 806 A.2d 39, 42 (Pa.Super.2002). Accordingly, we grant PENNVEST's application to strike the exhibits attached to the Sewer Authority's memorandum of law.

D.35 is contrary to the intent of the Investment Authority Act to finance projects at a below-market interest rate and that PENNVEST's ownership of nutrient credits is not authorized by the Investment Authority Act, the Clean Water Act or the regulations thereunder. It insists that PENNVEST must first promulgate regulations complying with the Act of July 31, 1968, P.L. 769, 45 P.S. §§ 1102–1602, and 45 Pa.C.S. §§ 501–907, commonly known as the Commonwealth Documents Law, to claim the ownership of nutrient credits.

 Administrative agencies' powers and authority must be conferred by clear and unmistakable legislative language. *Dep't of Transp. v. Beam*, 567 Pa. 492, 495, 788 A.2d 357, 359 (2002). This rule requiring express legislative delegation, however, "is tempered by the recognition that an administrative agency is vested with the implied authority necessary to the effectuation of its express mandates," because the Legislature "cannot foresee all the problems incidental to" the agency's carrying out its duties and responsibilities. *Id.* at 496, 788 A.2d at 360.

 PENNVEST's authority to recoup the value of the subsidy provided to the Sewer Authority's project is implied by PENNVEST's broad powers expressly granted by the Investment Authority Act. Section 6 of the Act, 35 P.S. § 751.6, provides that PENNVEST "shall have and may exercise all powers necessary or appropriate to carry out and effectuate the purposes of this act." The Act further authorizes PENNVEST to "[m]ake contracts of every name and nature and execute all instruments necessary or convenient for the carrying on of its business," to "[c]ollect fees and charges relating to projects funded under this act, as the board [of directors of PENNVEST] determines to be reasonable, relating to activities undertaken in furtherance of the purposes of this act," and to *"[d]o any act necessary or convenient to the exercise of the powers enumerated in this section or reasonably implied therefrom."* Section 6(5), (9) and (18) of the Act, 35 P.S. § 751.6(5), (9) and (18) (emphasis added).

In addition, PENNVEST's board of director has *"the power to set terms applicable to loans in any manner it deems appropriate,"* subject to the subsections of Section 10(f). Section 10(f) of the Investment Authority Act (emphasis added). In awarding loans, PENNVEST may consider "such factors as it deems relevant, including current market interest rates, the financial and economic distress of the area which the project serves, and *the necessity to maintain the [PENNVEST] funds in a financially sound manner." Id.* (Emphasis added.) The Investment Authority Act requires PENNVEST's board of directors to "establish a general fund from which it may authorize expenditures for any purposes of" the Act. Section 5(c)(1), 35 P.S. § 751.5(c)(1). The Investment Authority Act also requires the board to establish "a Water Pollution Control Revolving Fund" and authorizes it to establish "such other separate revolving funds and accounts when determined ... to be necessary or convenient." Section 5(c)(2).

In the September 18, 2012 letter, Marchetti stated that PENNVEST's ownership of nutrient credits would support the viability of the PENNVEST Nutrient Credit Clearinghouse established to promote the stability of the Nutrient Credit Trading Program and to allow NPDES permittees to more efficiently meet the effluent limits for the Chesapeake Bay Watershed, and that the ownership would also support PENNVEST's carrying out its business. PENNVEST's authority to recoup the value of the subsidy for such purposes is reasonably implied from its broad powers expressly granted to set

terms of the loans, to collect fees and charges for the financed projects, to maintain the funds established to promote the purposes of the Investment Authority Act and the Water and Sewer Systems Assistance Act, to maintain its funds in financially sound manner, and to do any act necessary and appropriate to exercise its powers expressly granted or reasonably implied therefrom.

According to the Sewer Authority, PENNVEST's use of nutrient credits to support the PENNVEST Nutrient Credit Clearinghouse violates 40 C.F.R. § 31.25(g)(2) and (3), requiring "program income"[7] to be used for the purposes and under the conditions of the Grant Agreement between EPA and PENNVEST. Under Section 31.25(g)(2) and (3), "[w]hen authorized," program income may be added to the funds committed to the grant agreement or used to meet the cost sharing or matching requirement of the grant agreement. PENNVEST and DEP established the Nutrient Credit Clearinghouse "with the approval of [EPA]." Marchetti's September 18, 2012 Letter. Contrary to the Sewer Authority's assertion, the recoupment of the subsidy value in order to fund that program is authorized and is consistent with the purposes and conditions of the Grant Agreement.

The Sewer Authority further argues that Section D.35 is void and unenforceable because the Sewer Authority is prohibited from "giving away nutrient credits absent full and fair compensation." Sewer Authority's Memorandum of Law in Opposition to the Preliminary Objections at 12. It claims that the use of nutrient credits to support the Nutrient Credit Clearinghouse program is not related to the Sewer Authority's mission, citing Section 5612(a.1)(1) of the Municipality Authorities Act, as amended, 53 Pa.C.S. § 5612(a.1)(1), which provides that "[m]oney of the authority may not be used for any grant, loan or other expenditure for any purpose other than a service or project directly related to the mission or purpose of the authority. . . ." It claims that Section D.35 violates the Fourteenth Amendment to the United States Constitution prohibiting an unlawful taking of property without just compensation. PENNVEST responds that before the execution of the Funding Agreement, the Sewer Authority's counsel submitted an Opinion of Counsel, stating that the Sewer Authority had the powers and authority to enter into the agreement and could comply with its terms.

■ · The Sewer Authority acknowledges that it performed a proprietary function, as opposed to a governmental function, in entering into the Funding Agreement to finance the improvement of the wastewater treatment facility. *See Program Admin. Servs. Inc. v. Dauphin Cnty. Gen. Auth.*, 874 A.2d 722, 728 (Pa. Cmwlth.2005), *aff'd*, 593 Pa. 184, 928 A.2d 1013 (2007) (holding that the Dauphin County General Authority's lending of money to the school districts to finance school constructions was proprietary in nature). Municipalities acting in a proprietary function are "governed by the same rules in the interpretation and enforcement of . . . contracts as private citizen, and will not be permitted, at its pleasure, to violate or abandon such contracts." *Henry Shenk Co. v. Erie Cnty.*, 319 Pa. 100, 103, 178 A. 662, 663 (1935).

■ The Sewer Authority fails to present any basis for invalidating Section D.35. The Sewer Authority does not dispute that

---

**7.** Program income is "gross income received by the grantee or subgrantee directly generated by a grant supported activity, or earned only as a result of the grant agreement during the grant period." 40 C.F.R. § 31.25(b).

it had the full knowledge of the terms of Section D.35 when it entered into the Funding Agreement and that the language in Section D.35 is clear and unambiguous. Consequently, the Court is required to give effect to the language in Section D.35 and cannot go further than its plain meaning. *Progressive N. Ins. Co. v. Schneck,* 572 Pa. 216, 221, 813 A.2d 828, 831 (2002). Where, as here, the terms of the contract are not prohibited by the federal or state statutes or the regulations thereunder, the contract "is a valid agreement when both parties agree to its terms and conditions." *Allegheny Cnty. Hous. Auth. v. Morrissey,* 651 A.2d 632, 637 (Pa.Cmwlth.1994). We conclude that Section D.35 of the Funding Agreement is valid and enforceable and that the Sewer Authority is bound by its terms.

 In arguing that PENNVEST attempted to take away nutrient credits *owned* by the Sewer Authority without compensation, the Sewer Authority incorrectly assumed its ownership of nutrient credits, when PENNVEST, not the Sewer Authority, is the owner of nutrient credits under the clear and unambiguous terms of Section D.35. Unquestionably, the Sewer Authority's compliance with the nutrient discharge limit serves its mission and purpose under Section 5612(a.1)(1) of the Municipality Authorities Act. The Sewer Authority agreed to PENNVEST's ownership of nutrient credits to the extent of the value of the interest rate subsidy in exchange for obtaining the low interest loan, which enabled it to commence the improvement of the wastewater treatment facility and to reduce the nutrient discharge. The facts simply do not support the argument that PENNVEST took the property owned by the Sewer Authority without compensation.

 Moreover, a political subdivision, such as the Sewer Authority, " 'created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator.' " *Ysursa v. Pocatello Educ. Ass'n,* 555 U.S. 353, 363, 129 S.Ct. 1093, 172 L.Ed.2d 770 (2009) [quoting *Williams v. Mayor & City Council of Baltimore,* 289 U.S. 36, 40, 53 S.Ct. 431, 77 L.Ed. 1015 (1933) ]. Consequently, a municipal corporation cannot invoke a constitutional right against its own state. *S. Macomb Disposal Auth. v. Twp. of Washington,* 790 F.2d 500, 504 (6th Cir.1986). Hence, the Sewer Authority cannot bring an action against PENNVEST, an instrumentality of the Commonwealth, invoking protection under the Fourteenth Amendment.

## IV.

PENNVEST demurs to the Sewer Authority's breach of contract claims in Counts I and II of the first amended petition for review. PENNVEST argues that the Sewer Authority's allegation of harms suffered from the alleged breach of contract is "vague." Preliminary Objections, ¶ 72.

Section F.2.a of the Funding Agreement provides that "[t]he disbursement of funds from [PENNVEST] shall be made to the Funding Recipient in increments as progress payments upon the completion of work and the submission of both the pay request ... and coincident submission of a complete and fully executed application form to [PENNVEST]." Section F.3.a of the Funding Agreement requires the Sewer Authority to submit payment requests to PENNVEST "for the costs of work performed and materials provided not more than once monthly."

 The elements of a breach of contract are (1) the existence of a contract, (2) a breach of the duty imposed by the

contract and (3) damages resulting from the breach. *Orbisonia–Rockhill Joint Mun. Auth. v. Cromwell Twp.*, 978 A.2d 425, 428 (Pa.Cmwlth.2009). The Sewer Authority alleges:

69. The [Sewer] Authority has fully performed under the contract and all conditions precedent to the performance by PENNVEST have occurred.

70. In refusing to provide payment under the Funding Agreement after a valid ... request for such payment, PENNVEST has breached the Funding Agreement without legal cause therefor[ ].

71. The [Sewer] Authority is injured by PENNVEST's breach of contract because, *inter alia*, PENNVEST's withholding of funds will cause the cessation of the WWTP [wastewater treatment plant] construction project in violation of the Permit and the federal Consent Decree....

First Amended Petition for Review, ¶¶ 69–71.

The Sewer Authority's allegations, if proven, may constitute a breach of contract by PENNVEST. PENNVEST's demurrer to the breach of contract claim, therefore, must be overruled. The motion for summary relief, however, cannot be granted based solely on the Sewer Authority's allegations. PENNVEST filed the preliminary objections and has not filed an answer to the first amended petition for review either admitting or denying the Sewer Authority's allegations, let alone any new matter or counterclaims relating to the Sewer Authority's conduct with respect to the nutrient credit issue. In order to prevail on the breach of contract claim, the Sewer Authority must prove the alleged facts. Because the Sewer Authority's right to relief is not clear at this stage of the proceeding, the motion for summary relief must be denied.

## V.

■■■ PENNVEST also raises the Sewer Authority's failure to state causes of action for declaratory and injunctive relief in separate counts. The practice and procedure "relating to pleadings in original jurisdiction petition for review practice shall be in accordance with the appropriate Pennsylvania Rules of Civil Procedure, so far as they may be applied," unless otherwise prescribed by the appellate rules. Rule 1517 of the Pennsylvania Rules of Appellate Procedure, Pa. R.A.P. 1517. Rule 1020(a) of the Pennsylvania Rules of Civil Procedure, Pa. R.C.P. No. 1020(a), provides: "The plaintiff may state in the complaint more than one cause of action cognizable in a civil action against the same defendant. Each cause of action and any special damage related thereto shall be stated in a separate count containing a demand for relief." We agree with PENNVEST that Count I improperly combines a cause of action for declaratory judgment seeking to strike the provision regarding nutrient credits with a cause of action not otherwise described in Count I to enjoin a breach of the Funding Agreement by PENNVEST. Nonetheless, since we will dismiss that portion of Count I which deals with nutrient credits, only the cause of action seeking to enjoin a breach of contract remains, and it is unnecessary for the Sewer Authority to re-plead. As to Count II, it contains only a cause of action for breach of contract seeking to enjoin the withholding of funds. To the extent the demand for relief also seeks a "declaratory judgment that PENNVEST's withholding of funds ... is a breach of contract," this demand can be viewed as either simply an alternative form of injunctive relief based on a single cause of action for breach of contract or as mere surplusage, since any injunction would necessarily be predicated

on a finding that withholding of funds amounted to a breach. Accordingly, we will overrule this preliminary objection.

Based on the foregoing discussion, the Sewer Authority's motion for summary relief is denied. PENNVEST's preliminary objections to Count I are sustained to the extent that the Sewer Authority seeks a declaration that Section D.35 of the Funding Agreement is void, and Count I is dismissed to the extent of seeking such relief. PENNVEST's preliminary objections to Counts I and II seeking declaratory and injunctive relief based on PENN-VEST's alleged breach of contract are overruled. The preliminary objections raising the failure to comply with Rule 1020(a) of the Pennsylvania Rules of Civil Procedure are overruled. PENNVEST shall file an answer to the first amended petition for review within 30 days of the date of this Court's order.

### ORDER

AND NOW, this 12th day of November, 2013, the motion for summary relief filed by the Sewer Authority of the City of Scranton (Sewer Authority) is DENIED. The preliminary objections filed by Pennsylvania Infrastructure Investment Authority of the Commonwealth of Pennsylvania and its executive director, Paul Marchetti, (collectively PENNVEST), to Count I of the first amended petition for review are SUSTAINED to the extent that the Sewer Authority seeks a declaration that Section D.35 of the Funding Agreement is void, and Count I is DIS-MISSED to the extent of seeking such relief. The preliminary objections to Counts I and II seeking declaratory and injunctive relief for PENNVEST's alleged breach of contract are OVERRULED. The preliminary objections raising the failure to set forth causes of action in separate counts are OVERRULED. PENN-

VEST shall file an answer to the first amended petition for review within 30 days of the date of this order. PENN-VEST's application to strike two exhibits attached to the Sewer Authority's memorandum of law in opposition to the preliminary objections is GRANTED.